### BERTELSMANN et al. v. COE, Com'r of Patents.

### No. 65803.

District Court of the United States for the District of Columbia.

April 27, 1940.

Melvin W. Sandmeyer and Roy F. Steward, both of Washington, D. C., for plaintiffs.

W. W. Cochran, of Washington, D. C., for defendant.

LUHRING, Justice.

The plaintiff seeks a patent pursuant to R.S. § 4915, 35 U.S.C. § 63, 35 U.S.C. A. § 63, for an invention relating to improvement in process for replacing poisonous gas.

Three claims are involved, numbered 10, 11 and 12 respectively. These claims were rejected by the Examiner and on appeal by the Board of Appeals on the ground that they are unpatentable in view of the prior art as exemplified by the following patents: West et al., 1,505,065, August 12, 1924; Barnebey 1,680,840, August 24, 1928; Metallgesellschaft (Brit.), 301,459, December 24, 1929; Fulweiler (Brit.), 335,869, October 2, 1930; Kemmer (Brit.), 356,838, September 17, 1931; Perry et al., 1,949,810, March 6, 1934; and the publication, Bureau of Mines Bulletin 301 (1929) pp. 145 and 146, containing an article by William W. Odell showing that it is old to adjust gas to predetermined requirements as to its properties.

The principal object of the invention is to produce a practically nonpoisonous town gas which can be supplied by the public gas supply companies and used in the same gas consuming apparatus or appliances as the poisonous town gas which it is to replace.

As generally described in the specification, the process of the invention comprises producing initially a mixed gas of substantial carbon monoxide content and of a type generally similar to a given poisonous town gas which is to be replaced, but having a somewhat higher calorific value; then subjecting this initial gas to catalysis with steam under such conditions that the carbon monoxide content is very largely converted by reaction with the steam into carbon dioxide and hydrogen, the removal of the poisonous carbon monoxide from the gas, although not complete, being carried far enough to ensure its concentration being so small that the resultant gas is substantially non-poisonous. A further important feature of the invention resides in the fact that by properly adjusting the calorific value of the initial gas as aforesaid, the important burning properties of the final non-poisonous gas, namely, the calorific value, the specific gravity and the rate of flame propagation, are, by the steam catalysis, caused to sufficiently approximate or correspond to those of the poisonous town gas that is to be replaced. Such poisonous town gas may be considered, in any given instance, as affording a standard to be approximated by the non-poisonous gas insofar as concerns said important burning properties.

The carbon monoxide content of the end gas is not entirely eliminated, but is reduced to not exceeding 1% by volume. While this would be sufficient to cause death within a few minutes if the gas were to be breathed undiluted, it is pointed out "that due to the enormous dilution by the great volume of air in a room and the practical impossibility of altogether preventing ventilation, the concentration of carbon monoxide can not reach a lethal percentage where the carbon monoxide content of the gas itself does not exceed 1%." Pltfs.brief, p. 10. In other words, such little poison will do no harm.

It is not new to use the reaction of steam with carbon monoxide in the presence of a catalyst to convert poisonous fuel gas into a non-poisonous gas.

Kemmer had in mind the same objects as are sought by plaintiffs and used the same reaction of steam with carbon monoxide to eliminate the latter poisonous constituent. Kemmer, like plaintiffs, employed a catalyst, such as iron containing chromium oxide, to accelerate the reaction. He, also, recognized the necessity of controlling the composition of the final product so that it would have the necessary desirable properties to enable its use in the usual appliances.

Kemmer goes further than plaintiffs in that he converts the small percentage of carbon monoxide remaining after the first reaction into methane and thus eliminates all poison.

The British patent to Fulweiler, No. 335,869, October 2, 1930, also discloses a process of making a non-poisonous gas in which a portion of the starting gas is treated, as in plaintiff's process, with steam to convert the carbon monoxide

component into hydrogen and carbon dioxide. This is set forth on page 1 of the patent, beginning in line 35. In order that the resulting gas shall have a high calorific value Fulweiler treats a portion of the gas in such a manner as to transform the carbon monoxide and hydrogen components thereof into methane which is a very high heating calorific value. Fulweiler recognized that it was not necessary to remove the carbon monoxide entirely for he states, on page 2, beginning in line 12, that it may not be considered necessary in certain cases to carry the reactions to completion but that a small percentage of carbon monoxide may be left in the gas.

The Perry and Fulweiler patent, No. 1,949,810, discloses the same general procedure. See patent page 1, line 52 et seq.

The patentee recognized that it was not necessary in some cases to remove all of carbon monoxide and said, on page. 2, lines 18 to 21, that a substantial reduction or a complete removal of it may be accomplished. It is further stated in the patent that a catalyst may be used. (See page 1, line 93.)

The patent to West et al., No. 1,505,065, relates to the process of producing hydrogen from coal gas. This is accomplished by the injection of steam into the gas and conversion of carbon monoxide into carbon dioxide. This reaction is carried out in the presence of a catalyst. Here again the reaction is not carried to the extent of converting all of the carbon monoxide into carbon dioxide but, as in the Kemmer patent, the small amount of carbon monoxide remaining is converted into methane.

The court agrees with the conclusions of the Patent Office tribunals and finds that the process steps set forth in plaintiffs' claim numbered 10 are fully disclosed in the patents used as references. Indeed, the plaintiffs admit it was old to use the reaction of steam with carbon monoxide in the presence of a catalyst to produce non-poisonous gas, Plaintiff's Brief, p. 9, and certainly it would not be invention to leave a small percentage of carbon monoxide in the gas by omitting the step of the prior art of converting the remaining trace of carbon monoxide into methane.

The "initial mixed gas" of the plaintiffs is of a higher calorific value than the normal in order to compensate for the loss which is unavoidable in their process. This problem is solved by the prior patentees either by converting a portion of the initial gas into methane, which has a high heating value, or enriching it later to supply the deficiency. No invention is involved here.

Claims 11 and 12 have been dealt with adequately and convincingly by the Examiner and the Board of Appeals. The court adopts their views as its finding.

The plaintiffs' process is not in use in this country. It has been in commercial use in Hameln, Germany, since 1935, and, according to the stipulation, permission has been obtained to install plants to carry out the process in two other cities in Germany.

The court finds that the claims in issue are unpatentable in view of the prior art, and that the bill of complaint should be dismissed. It is so ordered, and counsel for defendant will submit formal findings of fact and conclusions of law in accord with this memorandum, together with appropriate judgment dismissing the bill of complaint.